**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TIMOTHY FERGUSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SCRANTON CARDIOVASCULAR PHYSICIAN SERVICES, LLC d/b/a GREAT VALLEY CARDIOLOGY,<br><br>Defendant. | Case No.<br><br>**COMPLAINT—CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Timothy Ferguson ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant Scranton Cardiovascular Physician Services, LLC d/b/a Great Valley Cardiology ("GVC" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to himself, which are based on personal knowledge:

## NATURE OF THE ACTION

1. Healthcare providers that handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—and especially hackers with

nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2. The harm resulting from a data privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3. GVC is a healthcare provider located in Scranton, Pennsylvania. Defendant provides healthcare services to patients across Northeastern Pennsylvania in Luzerne, Lackawanna, and Wayne Counties.

4. As a healthcare provider, GVC knowingly obtains, collects, and stores patient PII and PHI. In turn, GVC has a resulting duty to secure, maintain, protect, and safeguard the PII and PHI that it collects and stores against unauthorized access and disclosure through reasonable and adequate data security measures.

5. GVC expressly recognizes its duty to securely maintain its patients' PII and PHI in confidence. Its Notice of Privacy Practices states: "[w]e understand that

your medical information is personal. We are committed to protecting your medical information."[1]

6. Despite GVC's duty to safeguard its patients' PII and PHI, Plaintiff's and other patients' PII and/or PHI was allowed to be accessed and exposed to an unauthorized third party during a data breach of Defendant's computer network which occurred between February 2, and April 14, 2023, but which GVC did not disclose until on or about June 12, 2023 (the "Data Breach").[2]

7. Based on the public statements of GVC to date, a wide variety of patient PII and PHI was implicated in the Data Breach, including but not limited to: patient names, addresses, demographic information such as dates of birth, Social Security Numbers, driver's license numbers, passport numbers, credit card or debit card information, bank account information, health insurance information and health insurance claims information, and medical information (such as dates of service, diagnoses, medications, lab results, and other treatment information).[3]

---

[1] *Notice of Privacy Practices*, Commonwealth Health (Effective Oct. 16, 2016, https://www.commonwealthhealth.net/privacy-practices.

[2] Dissent, *Commonwealth Health Physician Network-Cardiology notified 181,764 patients of network breach*, DataBreaches.net (June 13, 2023), https://www.databreaches.net/commonwealth-health-physician-network-cardiology-notified-181764-patients-of-network-breach/.

[3] *Notice of Data Security* Incident, Commonwealth Health, https://www.cwhphysiciannetwork.net/security-incident (last visited June 29, 2023) ("Notice of Data Breach").

8. As a direct and proximate result of GVC's inadequate data security measures, and its breach of its duty to handle PII and PHI with reasonable care, Plaintiff's and Class Members' PII and PHI has been accessed by hackers and exposed to an untold number of unauthorized individuals.

9. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

10. Plaintiff, on behalf of himself, and the Class as defined herein, brings claims for negligence, negligence *per se*, breach of fiduciary duty, breach of confidence, and declaratory judgment, seeking actual and putative damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

## PARTIES

11. Plaintiff Timothy Ferguson is an adult, who at all relevant times, is a resident and citizen of the State of Pennsylvania. Plaintiff was a patient of GVC. Plaintiff received a Data Breach notice from GVC informing him that his PII and PHI that he entrusted to Defendant was compromised in the Data Breach.

12. As a result of the Data Breach, Plaintiff will continue to be at a heightened and certainly impending risk for fraud and identity theft, and their attendant damages for years to come.

13. Defendant Scranton Cardiovascular Physician Services, LLC is a Delaware limited liability company operating in Pennsylvania under the fictious name Great Valley Cardiology. Defendant Scranton Cardiovascular Physician Services, LLC is a part of the Commonwealth Health Physician Network, a division Community Health Systems, Inc.

14. Upon information and belief, Defendant Scranton Cardiovascular Physician Services, LLC is a subsidiary of Community Health Systems, Inc., and a single member limited liability company.

15. Upon information and belief, Defendant Scranton Cardiovascular Physician Services, LLC's sole limited liability member is Community Health Systems, Inc.

16. Community Health Systems, Inc. is a Delaware corporation with a principal place of business located at 4000 Meridian Boulevard, Franklin, Tennessee 27067. Defendant Scranton Cardiovascular Physician Services, LLC is a citizen of each state in which one of its members is a citizen. As such, Defendant Scranton Cardiovascular Physician Services, LLC is a citizen of the States of Tennessee and Delaware.

17. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here are currently unknown to Plaintiff.

18. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of such responsible parties when their identities become known.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class is a citizen of a state different than Defendant.

20. This Court has personal jurisdiction over Defendant because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District and Defendant engages in a substantial amount of business in this District.

21. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL BACKGROUND

### A. GVC Collected and Stored Plaintiff's and Class Members' PII and PHI.

22. GVC is part of Community Health Systems, Inc., an operator of a number of hospitals and healthcare practices across the United States. GVC provides healthcare services to patients across Northeastern Pennsylvania in Luzerne, Lackawanna, and Wayne Counties.

23. As a condition of providing healthcare services to Plaintiff and Class Members, GVC receives, creates, and handles PII and PHI, which include, *inter alia*, patient names, addresses, demographic information such as dates of birth, Social Security Numbers, driver's license numbers, passport numbers, credit card or debit card information, bank account information, health insurance information and health insurance claims information, and medical information (such as dates of service, diagnoses, medications, lab results, and other treatment information).

24. Plaintiff and Class Members must entrust GVC with their sensitive and confidential PII and PHI in order to receive health care services, and in return reasonably expected that GVC would safeguard their highly sensitive information and keep it confidential.

25. By obtaining, collecting, and storing Plaintiff's and Class Members' PII and PHI, GVC assumed equitable and legal duties to safeguard and keep confidential

Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

26. Even though GVC has a duty to safeguard Plaintiff's and Class Members' PII and PHI, Defendant nevertheless employed inadequate data security measures to protect and secure the PII and PHI patients entrusted to it, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII and PHI stored within its computer network.

**B. GVC Knew the Risks of Storing Valuable PII and PHI.**

27. GVC was well aware that the PII and PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

28. GVC also knew that a breach of its computer systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

29. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at business such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

30. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers easily can sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling

marketplace for such commerce."[4] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

31. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[5]

32. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[6]

33. The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the

[4] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.
[5] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.
[6] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited June 29, 2023).

nine reasons healthcare is now the biggest target for online attacks."[7] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific – and now obsolete – operating systems and cannot be transferred to supported operating systems."[8]

34. Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[9]

35. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure of the

---

[7] *The healthcare industry is at risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited June 29, 2023).

[8] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=
Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names.

[9] *Id.*

information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[10]

36. Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[11]

37. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[12]

38. The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July. The percentage of healthcare breaches attributed to malicious activity rose more than

---

[10] *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited June 29, 2023).

[11] *Id.*

[12] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report (last visited June 29, 2023).

5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[13]

39. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves GVC's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

40. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

41. The Social Security Administration even warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle

[13] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

> agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[14]

42. Social Security Numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

43. **Driver's License Numbers—**are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an

[14] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

44. For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

45. Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

46. **Passport Numbers**—As explained by Aura, a leading identity theft protection service, "[p]assports are among the most widely accepted forms of identification, making them prime targets for scammers and fraudsters. If scammers steal your passport number, they can impersonate you, create fake travel documents, or even open bank accounts in your name."[15] Indeed, when combined with other PII,

[15] Yaniv Masjedi, *What Can Scammers Do With Your Passport Number*?, Aura (Apr. 12, 2023), https://www.aura.com/learn/what-can-someone-do-with-your-passport-

such as a name, address, or picture, a "passport number enables scammers to impersonate you, access your online accounts, or target you in sophisticated scams that lead to identity theft."[16]

47. Moreover, "[u]nlike credit card data or personal Social Security numbers, there are few mechanisms in place to alert consumers that their passport numbers have been stolen and possibly used for fraud" making it difficult to determine if criminals are using a forged or fraudulent passport in an individual's name.[17]

48. **Financial Account Information**—Stolen financial account information can have an equally devasting impact on individuals. Cybercriminals can deplete and wipe out a person's life savings or take out a loan or mortgage against someone's home with the click of a button. Indeed, stolen financial account information can be used to transfer money from a victim's bank account to another; to make purchases on online shopping sites; file fake tax returns; and create and use fraudulent checks.[18]

---

number#:~:text=If%20scammers%20steal%20your%20passport,could%20still%20be%20at%20risk.

[16] *Id.*

[17] Kate Fazzini, *Here's how criminals use stolen passport information*, CNBC (July 5, 2019), https://www.cnbc.com/2019/07/05/how-criminals-use-stolen-passport-information.html.

[18] Anthony Aguilar, *What Can Scammers Do With Your Bank Account Number*, Aura (Oct. 5, 2022), https://www.aura.com/learn/what-can-someone-do-with-your-bank-account-number.

49. **Payment Card Information**—Cybercriminals can use stolen payment card information to create counterfeit payment cards and make unauthorized charges or withdrawals that can cause consumers to incur significant financial losses. Indeed, the counterfeit payment cards (or the compromised payment card information itself) can be used to purchase high-ticket goods or gift cards that can then be sold for cash all while charging the consumer's original card. Cybercriminals can also sell the stolen payment card information to other cybercriminals on the dark web. In turn, when a payment card is fraudulently used, it can damage the cardholder's credit score, making it difficult to obtain new credit in the future.

50. **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[19] A complete identity theft kit that includes health insurance credentials

[19] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, *New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[20]

51. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[21]

52. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[22]

53. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare

---

[20] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited June 29, 2023).

[21] Alder, *supra* note 8.

[22] *Id.*

> networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[23]

54. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[24]

---

[23] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[24] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf (last visited June 29, 2023).

55. **Health Insurance Information**—"stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[25]

56. Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

57. Based on the value of its patients' PII and PHI to cybercriminals, GVC knew or should have known, the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were

[25] Kate O'Flaherty, *Why cyber-Criminals Are Attacking Healthcare -- And How to Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69.

breached. GVC failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

**C. GVC Breached its Duty to Protect its Patients' PII and PHI.**

58. On or about June 12, 2023, GVC announced that it suffered a cyberattack, during which personal information of its patients was exposed.[26]

59. According to Defendant, on or about April 13, 2023, GVC became aware that unauthorized parties may have gained access to its computer network.[27]

60. However, GVC did not discover the unauthorized access itself. Rather, Defendant did not discover the unauthorized access until the United States Department of Homeland Security ("DHS") notified GVC that unauthorized third parties gained access to GVC's systems as a result of a successful brute force attack.[28]

61. A "brute force" attack occurs when an unauthorized third party uses software to generate passwords until one is successful.[29] As such, once the password was discovered, the unauthorized third party was able to enter GVC's computer network.[30]

---

[26] Dissent, *supra* note 2.
[27] *Notice of Data Breach*, supra note 3.
[28] *Borys Krawczeniuk, Records of more than 181,000 patients, others at Scranton cardiology group lasted to be backed in NEPA*, yahoo!news (June 12, 2023), https://news.yahoo.com/records-more-181-000-patients-000400881.html.
[29] *Id.*
[30] *Id.*

62. Upon being alerted of the Data Breach, GVC conducted an investigation which determined that between February 2, 2023, and April 14, 2023, unauthorized parties gained access to GVC's computer network.[31] Put differently, unauthorized third parties had access to Defendant's computer network for nearly two months and GVC did not recognize the breach occurred until notified of the Data Breach by DHS.

63. GVC further confirmed that during the Data Breach, the unauthorized third parties were able to gain access to the personal information of Defendant's patients.[32]

64. The information compromised in the Data Breach includes, but is not limited to, patient names, addresses, demographic information such as dates of birth, Social Security Numbers, driver's license numbers, passport numbers, credit card or debit card information, bank account information, health insurance information and health insurance claims information, and medical information (such as dates of service, diagnoses, medications, lab results, and other treatment information).[33]

---

[31] *Notice of Data Breach*, supra note 3.
[32] *Id.*
[33] *Id.*

65. On or about June 12, 2023, GVC notified the United States Department of Health and Human Services, Office for Civil Rights ("HHS") of the Data Breach, indicating that the Data Breach impacted approximately 181,000 individuals.[34]

66. On or about the same time that GVC notified HHS of the Data Breach, Plaintiff received a Data Breach notice from Defendant informing him that his PII and PHI entrusted to GVC was compromised during the Data Breach.

67. Upon information and belief, Class Members received similar Data Breach notices from Defendant informing them that their PII and PHI entrusted to GVC was compromised during the Data Breach.

68. Successful brute force attacks like the one which led to the compromise of Plaintiff's and Class Members' PII and PHI are readily preventable. Organizations with adequate cyber security measures employ the following measures to prevent brute force attacks: implementing strong password policies that make it difficult to guess a password; limiting the number of incorrect password attempts allowed by locking out accounts after a certain number of incorrect password attempts; limiting the number of login attempts to users coming from a specific IP address or range;

[34] *Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information*, U.S. Department of Health & Human Services Office for Civil Rights, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited June 29, 2023).

implementing multi-factor authentication; implementing CAPTCHAs; implementing web application firewalls; and disabling root Secure Shell logins.

69. Upon information and belief, the Data Breach is the direct and proximate result of GVC's failure to implement one or more of the above data security measures routinely used to prevent brute force attacks.

**D. GVC is Obligated Under HIPAA to Safeguard Patient PHI.**

70. GVC is required by the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1302d, *et seq*. ("HIPAA") to safeguard patient PHI.

71. GVC is an entity covered by HIPAA, which sets minimum federal standards for privacy and security of PHI.

72. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

73. Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media"; "[m]aintained in electronic media"; or "[t]ransmitted or maintained in any other form or medium."

74. Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health

care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual"; or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

75. HIPAA requires GVC to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*.

76. While HIPAA permits healthcare providers to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

77. As such, GVC is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it requires, receives, and collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

78. Given the application of HIPAA to GVC, and that Plaintiff and Class Members entrusted their PHI to Defendant in order to receive medical treatment, Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

**E. FTC Guidelines Prohibit GVC From Engaging in Unfair or Deceptive Acts or Practices.**

79. GVC is prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

80. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[35]

81. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of

[35] *Start with Security – A Guide for Business*, U.S. FED. TRADE COMM'N (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited on June 29, 2023).

personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[36]

82. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[37]

83. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

84. GVC failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect

[36] *Protecting Personal Information: A Guide for Business*, U.S. FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited on June 29, 2023).
[37] *Id*.

against unauthorized access to patient PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

85. GVC was at all times fully aware of its obligations to protect the PII and PHI of patients because of its position as a healthcare provider, which gave it direct access to reams of patient PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F. Plaintiff and Class Members Suffered Damages.**

86. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiff, and members of the Class, significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

87. Once PII and PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened

measures for years, and possibly their entire lives as a result of GVC's conduct. Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

88. As a result of GVC's failures, Plaintiff and Class Members are also at substantial increased risk of suffering identity theft and fraud or misuse of their PHI.

89. From a recent study, 28% of consumers affected by a data breach become victims of identity fraud – this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[38]

90. With respect to health care breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[39]

91. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[40]

---

[38] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KNOWBE4 (Mar. 7, 2023), https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud.
[39] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HEALTH IT SEC. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[40] *Id.*

92. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[41]

93. Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[42]

94. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[43]

95. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as GVC fails to undertake the necessary and appropriate security and training measures to protect its patients' PII and PHI.

[41] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[42] *Id.*
[43] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, EXPERIAN (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited June 29, 2023).

96. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

## CLASS ACTION ALLEGATIONS

97. Plaintiff brings this class action on behalf of himself, and all other individuals who are similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

98. Plaintiff seeks to represent a class of persons to be defined as follows:

> All individuals in the United States and its territories whose PII and/or PHI was compromised in the GVC Data Breach which was announced on or about June 12, 2023 (the "Class").

99. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

100. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

101. **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through GVC's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 181,000 individuals.

102. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether GVC had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether GVC was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of GVC's wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of GVC's wrongful conduct.

103. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff

and members of the Class were all patients of GVC, each having their PII and PHI exposed and/or accessed by an unauthorized third party.

104. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

105. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, expense, and promote uniform decision-making.

106. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any,

pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, GVC's liability and the fact of damages is common to Plaintiff and each member of the Class. If GVC breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

107. **Injunctive Relief:** GVC has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. Civ. P. 23(b)(2).

108. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria and Class Members may be readily identified through Defendant's books and records.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
## (Plaintiff on Behalf of the Class)

109. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

110. GVC owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

111. GVC's duty to use reasonable care arose from several sources, including but not limited to those described below.

112. GVC's has a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By receiving, maintaining, and handling PII and PHI that is routinely targeted by criminals for unauthorized access, GVC was obligated to act with reasonable care to protect against these foreseeable threats.

113. GVC's duty also arose from Defendant's position as a healthcare provider. GVC holds itself out as a trusted provider of medication services, thereby assuming a duty to reasonably protect the information it obtains from its patients. Indeed, Defendant, who receives, maintains, collects, and handles PII and PHI from its patients, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

114. GVC breached the duties owed to Plaintiff and Class Members and was thus negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the

security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

115. But for GVC's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

116. As a direct and proximate result of GVC's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII and/or PHI;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is

subject to further breaches so long as Defendant fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

117. As a direct and proximate result of GVC's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE PER SE**
**(Plaintiff on Behalf of the Class)**

118. Plaintiff restates and realleges the preceding factual allegations set forth above as if fully alleged herein.

119. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant for failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of GVC's duty.

120. GVC violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI its obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI its entrusted from its patients.

121. Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

122. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

123. GVC is an entity covered under the HIPAA, which sets minimum federal standards for privacy and security of PHI.

124. Pursuant to HIPAA, 42 U.S.C. § 1302d, *e. seq.*, and its implementing regulations, GVC had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class members' electronic PHI.

125. Specifically, HIPAA required Defendant to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably

anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 CFR § 164.102, *et seq*.

126. Defendant violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; and by failing to timely notify Plaintiff and Class Members of a breach of their PHI.

127. Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are patients of GVC.

128. GVC's violation of HIPAA constitutes negligence *per se*.

129. The harm that has occurred as a result of GVC's conduct is the type of harm that the FTC Act and HIPAA were intended to guard against.

130. As a direct and proximate result of GVC's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII and/or PHI;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is

subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

131. As a direct and proximate result of GVC's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

132. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

133. Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by GVC and that was ultimately accessed or compromised in the Data Breach.

134. As a healthcare provider, and recipient of patients' PII and PHI, GVC has a fiduciary relationship to its patients, like Plaintiff and the Class Members.

135. Because of that fiduciary relationship, GVC was provided with and stored private and valuable PHI and PII related to Plaintiff and the Class. Plaintiff and the Class were entitled to expect their information would remain confidential while in GVC's possession.

136. Defendant owed a fiduciary duty under common law to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in GVC's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

137. As a result of the parties' fiduciary relationship, GVC had an obligation to maintain the confidentiality of the information within Plaintiff's and the Class Members' medical records.

138. GVC's patients, like Plaintiff and Class Members, have a privacy interest in personal medical matters, and GVC had a fiduciary duty not to disclose medical data concerning its patients.

139. As a result of the parties' relationship, GVC had possession and knowledge of confidential PII and PHI of Plaintiff and Class Members, information not generally known.

140. Plaintiff and Class Members did not consent to nor authorize GVC to release or disclose their PII and PHI to unknown criminal actors.

141. GVC breached its fiduciary duties owed to Plaintiff and Class Members by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its patients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

142. But for GVC's wrongful breach of its fiduciary duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

143. As a direct and proximate result of GVC's breach of fiduciary duties, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII and/or PHI;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and

Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class Members.

144. As a direct and proximate result of GVC's breach of its fiduciary duties, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiff and the Class)**

145. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

146. Plaintiff and Class Members have an interest, both equitable and legal, in the PII and PHI about them that was conveyed to, collected by, and maintained by GVC and that was ultimately accessed or compromised in the Data Breach.

147. As a healthcare provider, GVC has a special relationship to its patients, like Plaintiff and the Class Members.

148. Because of that special relationship, Defendant was provided with and stored private and valuable PHI related to Plaintiff and the Class, which it was required to maintain in confidence.

149. Plaintiff and the Class provided GVC with their personal and confidential PHI under both the express and/or implied agreement of Defendant to limit the use and disclosure of such PHI.

150. GVC owed a duty to Plaintiff and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PHI in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

151. Defendant had an obligation to maintain the confidentiality of Plaintiff's and the Class Members' PHI.

152. Plaintiff and Class Members have a privacy interest in their personal medical matters, and GVC had a duty not to disclose confidential medical information and records concerning its patients.

153. As a result of the parties' relationship, GVC had possession and knowledge of confidential PHI and confidential medical records of Plaintiff and Class Members.

154. Plaintiff's and the Class's PHI is not generally known to the public and is confidential by nature.

155. Plaintiff and Class Members did not consent to nor authorize Defendant to release or disclose their PHI to an unknown criminal actor.

156. GVC breached the duties of confidence it owed to Plaintiff and Class Members when Plaintiff's and the Class's PHI was disclosed to unknown criminal hackers.

157. Defendant breached its duties of confidence by failing to safeguard Plaintiff's and Class Members' PHI, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances

alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its on privacy policies and practices published to its patients; (h) storing PHI and medical records/information in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and release of Plaintiff and the Class Members' PHI and medical records/information to a criminal third party.

158. But for Defendant's wrongful breach of its duty of confidences owed to Plaintiff and Class Members, their privacy, confidences, and PHI would not have been compromised.

159. As a direct and proximate result GVC's breach of Plaintiff's and the Class's confidences, Plaintiff and Class Members have suffered injuries, including:

a. The erosion of the essential and confidential relationship between Defendant – as a health care services provider – and Plaintiff and Class Members as patients;

b. Loss of their privacy and confidentiality in their PHI;

c. Theft of their PII and/or PHI;

d. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

e. Costs associated with purchasing credit monitoring and identity theft protection services;

f. Lowered credit scores resulting from credit inquiries following fraudulent activities;

g. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

h. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

i. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

j. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is

subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data;

k. Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received, as directed to do by Defendant; and

l. Mental anguish accompanying the loss of confidences and disclosure of their confidential and private PHI.

160. Additionally, GVC received payments from Plaintiff and Class Members for services with the understanding that Defendant would uphold its responsibilities to maintain the confidences of Plaintiff's and Class Members' private medical information.

161. GVC breached the confidence of Plaintiff and Class Members when it made an unauthorized release and disclosure of their confidential medical information and/or PHI and, accordingly, it would be inequitable for GVC to retain the benefit at Plaintiff's and Class Members' expense.

162. As a direct and proximate result of GVC's breach of its duty of confidences, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(Plaintiff on Behalf of the Class)**

163. Plaintiff restates and realleges all preceding allegations above as if fully set forth herein.

164. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

165. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether GVC is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that GVC's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of his PII and PHI and remains at imminent risk that further compromises of his PII and/or PHI will occur in the future.

166. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. GVC owed a legal duty to secure patients' PII and PHI under the common law, Section 5 of the FTC Act, and HIPAA; and

b. GVC breached and continues to breach this legal duty by failing to employ reasonable measures to secure patients' PII and PHI.

167. This Court also should issue corresponding prospective injunctive relief requiring GVC to employ adequate security protocols consistent with law and industry standards to protect patients' PII and PHI.

168. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at GVC. The risk of another such breach is real, immediate, and substantial. If another breach at GVC occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

169. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to GVC if an injunction is issued. Plaintiff and Class members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and GVC has a pre-existing legal obligation to employ such measures.

170. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another

data breach at GVC, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and patients whose confidential information would be further compromised.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: July 5, 2023

Respectfully submitted,

*/s/ Gary F. Lynch*

Gary F. Lynch
Jamisen A. Etzel
Nicholas A. Colella
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
gary@lcllp.com
jamisen@lcllp.com
nickc@lcllp.com

*Attorneys for Plaintiff*